755 F.2d 485
 Rex RAMEY (84-3063), Ross Lewis (84-3128), Petitioners,
v.
KENTLAND ELKHORN COAL CORPORATION (84-3063), Left Beaver
Coal Company (84- 3128), Employers-Respondents,
Director, Office of Workers' Compensation Programs, United
States Department of Labor; Benefits Review
Board, Party-In-Interest-Respondent.
 Nos. 84-3063, 84-3128.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 7, 1984.
Decided Feb. 19, 1985.
 
 Herbert Deskins, Jr., Deskins & Pafunda, Pikeville, Ky., David Thomas, argued, Nicholsville, Ky., for petitioner in No. 84-3063.
 John Earl Hunt, Burchett & Barber, J. Logan Griffith, Mann & Griffith Law Firm, Prestonsburg, Ky., for petitioner in No. 84-3128.
 John L. Kilcullen, Kieran F. Kilcullen, Kilcullen, Wilson & Kilcullen, Mark E. Solomons, argued, Washington, D.C., Paul Jones, Baird & Baird, P.S.C., Pikeville, Ky., for employers-respondents.
 Benefits Review Bd., U.S. Dept. of Labor, Denise Butler Harty, Joseph T. Bednarik, J. Michael O'Neill, argued, U.S. Dept. of Labor, Washington, D.C., for party-in-interest-respondent.
 Before MARTIN and JONES, Circuit Judges, and BROWN, Senior Circuit Judge.
 BAILEY BROWN, Senior Circuit Judge.
 
 
 1
 In both of these cases, petitioners seek reversal of the Benefits Review Board's (Board) decisions denying them black lung benefits. Rex Ramey worked as a coal miner for forty-two years until 1976. Ross Lewis was also employed as a miner until 1976, having worked twenty-nine years in the coal mines.
 
 
 2
 An administrative law judge (ALJ) found that Ramey was entitled to invoke the 20 C.F.R. Sec. 727.203(a)[1] presumption of total disability due to pneumoconiosis because x-ray evidence demonstrated the presence of pneumoconiosis. The ALJ found, however, that the employer rebutted the presumption under 20 C.F.R. Sec. 727.203(b)(2)[2] by showing through medical evidence that Ramey was physically capable of working in the mines. The Board affirmed this decision, finding that it was supported by substantial evidence.
 
 
 3
 An ALJ also found that Lewis was entitled to invoke the rebuttable presumption of 20 C.F.R. Sec. 727.203(a) based on x-ray evidence. The ALJ concluded, however, that the employer rebutted the presumption under both 20 C.F.R. Sec. 727.203(b)(2)[3] and Sec. 727.203(b)(3). The ALJ determined that Lewis was not totally disabled for mine work by pulmonary disease, but that Lewis suffered from a totally disabling cardiac condition--a condition that the ALJ found did not arise in whole or in part from Lewis' coal mine employment.
 
 
 4
 In this appeal, both petitioners claim that the ALJs' decisions are not supported by substantial evidence. The finding of an ALJ in a black lung case may not be set aside if it is based on substantial evidence viewing the record as a whole, even if we would have taken a different view of the evidence were we the trier of facts. Moore v. Califano, 633 F.2d 727, 729 (6th Cir.1980). The petitioners also contend that the ALJs should have considered medical and vocational evidence before determining that the 20 C.F.R. Sec. 727.203(a) presumption of total disability was rebutted pursuant to 20 C.F.R. Sec. 727.203(b)(2). We conclude that the ALJs' decisions were based on substantial evidence and that vocational evidence need not be considered. Both decisions are affirmed.
 
 I. Ramey
 A. Substantial Evidence
 
 5
 We must first determine, assuming at this point that vocational evidence is unnecessary, whether the ALJ's determination that the presumption was rebutted is based on substantial evidence.
 
 
 6
 Dr. T.L. Wright examined Ramey on March 17, 1978, and diagnosed category 2/2 simple pneumoconiosis. Dr. Wright opined that Ramey was totally and permanently disabled "for coal mining, arduous labor, and work in a dusty environment." A pulmonary function study (PFS) conducted by Dr. Wright revealed a forced vital capacity of 100 percent of predicted normal, a one second forced expiratory volume of 101 percent of predicted normal and maximum voluntary ventilation of 145 percent of predicted normal. The blood gas study showed pO2 of 59.6 and pCO2 of 36.8. The blood gas values are sufficient to invoke the presumption in 20 C.F.R. Sec. 727.203(a).
 
 
 7
 On April 20, 1979, Dr. Harvey Page examined Ramey and diagnosed category 1/2 simple pneumoconiosis. He found that the claimant's PFS exceeded predicted normal values and was below predicted normal levels for the maximum voluntary ventilation. Dr. Page advised Ramey against further exposure to coal mine dust. Dr. Gene Combs, a Board certified radiologist and a "B" reader,[4] reviewed the x-ray taken by Dr. Page and found no evidence of pneumoconiosis.
 
 
 8
 Dr. Richard O'Neill, a specialist in internal medicine, examined Ramey on April 26, 1979, and found that an x-ray revealed stage 1/1 simple pneumoconiosis. He opined that the PFS revealed moderate small airways disease. A blood gas study showed a pO2 of 79 and pCO2 of 40. Dr. O'Neill found that the blood gas study revealed mild arterial hypoxemia.
 
 
 9
 On April 26, 1979, Dr. J.E. Meyers examined Ramey and found that his x-ray did not indicate pneumoconiosis. He found that the claimant's ventilatory studies produced normal results. Ramey's blood gas studies revealed a pO2 of 82 and pCO2 of 34, and Dr. Meyers interpreted these blood gas studies as normal. Dr. Meyers opined that Ramey's advanced age rather than a pulmonary disability prevented Ramey's return to coal mine work. The doctor stated that "normal physical activity, in fact, appears feasible."
 
 
 10
 A June 26, 1979, examination of Ramey conducted by Dr. Ballard Wright, a chest physician, revealed that Ramey had no "occupational pneumoconiosis or occupational lung injury." The PFS revealed "no abnormalities." The blood gas studies produced a resulting pO2 of 77.3 and an exercise pO2 of 81.8. Dr. Ballard Wright concluded that Ramey's health was "normal." Dr. T.R. Marshall, a Board certified radiologist, reviewed an x-ray taken by Dr. Ballard Wright and agreed that the x-ray was negative for pneumoconiosis. Dr. Benjamin Felson, a Board certified radiologist and a "C" reader, also reviewed the x-ray taken by Dr. Ballard Wright and found that it showed no evidence of pneumoconiosis.
 
 
 11
 On June 30, 1979, Dr. Frank Varney, a general practitioner, examined Mr. Ramey and found that the claimant's x-ray revealed category 2/2 simple pneumoconiosis and concluded that Ramey should curtail his exposure to dust.
 
 
 12
 Dr. Brent Brandon, Board certified radiologist and "B" reader, read Ramey's x-ray taken on March 6, 1979, as showing a positive finding of 1/2 pneumoconiosis in the upper right and left zones. Dr. Brandon made a similar reading of an x-ray taken on July 19, 1979. On that date, he found nodular densities in the upper right and left upper lung zones, 1/2 "q" type. Dr. Brandon advised Ramey against further dust exposure. Dr. Combs, also a Board certified "B" reader, re-read the March 6, 1979, x-ray and agreed with Dr. Brandon's findings.
 
 
 13
 Dr. William H. Anderson, a pulmonary specialist, examined Ramey on July 30, 1979, and found category 2 simple pneumoconiosis. Pulmonary function studies conducted by Dr. Anderson showed a vital capacity of 113.6 and a maximum voluntary ventilation of 95.57 percent of predicted normal. The one second forced expiratory volume was 104 percent of predicted normal. Blood gas studies revealed a pO2 of 72 and a pCO2 of 34. Dr. Anderson cautioned Ramey against further dust exposure but opined that pneumoconiosis did not impair Ramey's functional ability to work.
 
 
 14
 The ALJ evaluated all the medical evidence and determined that Ramey suffered from a moderate degree of pneumoconiosis but that he did not have a respiratory or pulmonary impairment of sufficient severity to prevent his engaging in his usual coal mine employment, and therefore, the employer had rebutted the presumption. These findings were based on substantial evidence. Substantial evidence is "more than a mere scintilla;" substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). The ALJ's findings complied with this standard.
 
 B. Vocational Disability
 
 15
 It is Ramey's position that in order to rebut the presumption, the employer must not only establish by medical evidence that the Ramey is physically able to engage in coal mine work, but that the employer must also demonstrate that job opportunities in the coal mining industry are available to Ramey despite his occupational disease and that Ramey has a reasonable opportunity to be hired.[5] The employer-respondent and the Director maintain that vocational evidence need not be considered because the employer has rebutted the presumption by demonstrating through medical evidence that Ramey's pneumoconiosis is not disabling.
 
 
 16
 Whether a factfinder must consider vocational evidence when determining, pursuant to 20 C.F.R. Sec. 727.203(b)(2), if an employer has rebutted the presumption by proving the claimant is "able to do his usual coal mine work" is an issue of first impression in this circuit.[6] Several circuits, however, have considered the question and have determined that such rebuttal under 20 C.F.R. Sec. 727.203(b)(2) is solely a matter of medical evidence. Taft v. Alabama By-Products Corp., 733 F.2d 1518 (11th Cir.1984); Director, Office of Workers' Compensation Programs v. Beatrice Pocohontas Co., 698 F.2d 680 (4th Cir.1983). See also Sherry v. Tesone Coal Co., 4 BLR 1-377, aff'd without published opinion, 696 F.2d 985 (3d Cir.1982); Johnson v. Cannelton Industries, Inc., 2 BLR 1-1081 (1980). We agree with the result reached by these courts.
 
 
 17
 Congress enacted the Black Lung Benefits Act to provide benefits to coal miners who are totally disabled due to pneumoconiosis. 30 U.S.C.A. Sec. 901(a) (West Supp.1972-1983). The Act contains two distinct compensation programs: Part B and Part C. Part B of the Act is federally financed and administered by the Social Security Administration (SSA). Part C is administered by the Department of Labor, but benefits awarded under this Part are paid by a responsible mine operator.
 
 
 18
 Upon the enactment of the Black Lung Act of 1972, interim adjudicatory rules were issued that governed Part B disability claims, which are those filed before July 1, 1973. 20 C.F.R. Sec. 410.490. The rules were created to liberalize the black lung eligibility requirements and to facilitate prompt processing of black lung claims by the SSA. S.Rep. No. 743, 92d Cong., 2d Sess. 3, reprinted in 1972 U.S.Code Cong. & Ad.News 2305, 2307. These rules, however, were not applicable to Part C claims. 20 C.F.R. Sec. 410.490(b). As a result, benefits were more readily paid to Part B claimants than to Part C claimants. Hearings on H.R. 3476, H.R. 8834, H.R. 8835 and H.R. 8838 before the General Subcommittee on Labor of the House Committee on Education and Labor, 93d Cong., 1st & 2d Sess. 329, 341, 349, 399 (1973-74).
 
 
 19
 In 1977, Congress amended the black lung legislation by passing the Black Lung Benefits Reform Act of 1977. The House version of the bill would have applied the SSA rules to both Part B and Part C claims. H.R.Rep. No. 4544, 95th Cong., 1st Sess. Sec. 7(a) (1977). The Senate version of the bill, however, did not apply the SSA rules to Part C claims; instead the Senate bill authorized the Secretary of Labor to draft his own medical eligibility criteria to be used by the Department of Labor when adjudicating Part C claims. S.Rep. No. 209, 95th Cong., 1st Sess. (1977).
 
 
 20
 The Conference Committee adopted the Senate version of the bill with several provisos. The Committee agreed that the Department of Labor would promulgate regulations for the determination of total disability or death due to pneumoconiosis in Part C claims. H.R.Rep. No. 864, 95th Cong., 2d Sess. (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 237, 308, 309. Both Petitioner Lewis and Petitioner Ramey's Part C claims were filed during this interval between the passage of the 1977 Act and the promulgation of the Labor Department's regulations. The Conference Report provides guidance regarding the criteria to be applied to Part C claims filed before the Labor Department's permanent regulations were issued.
 
 The Conference Report states:
 
 21
 The conferees intend that the Secretary of Labor shall promulgate regulations for the determination of total disability or death due to pneumoconiosis. With respect to a claim filed or pending prior to the promulgation of such regulations, such regulations shall not provide more restrictive criteria than those applicable to a claim filed on June 30, 1973 [Part B claims], except that in determining claims under such criteria all relevant medical evidence shall be considered in accordance with standards prescribed by the Secretary of Labor and published in the Federal Register.
 
 
 22
 Id. (emphasis supplied). The language of the Conference Report indicates that the conferees intended to establish a medical test for rebuttal by showing that the claimant "is able to do his usual coal mine work."
 
 
 23
 It is clear to us that it was the intent of Congress, in legislating in 1977 with respect to Part C claims, that the Secretary's regulations would allow the rebuttal of the disability presumption by medical evidence that the claimant it not totally disabled for coal mine work due to black lung disease. This is precisely what the Secretary did in promulgating 20 C.F.R. Sec. 727.203(b)(2). It is true that, in the enactment of 30 U.S.C.A. Sec. 902(f)(2) (West Supp.1972-1983) as part of the 1977 Act, it is provided that the Secretary's "criteria" shall not be "more restrictive" than the criteria applicable to Part B claims. We do not believe, however, that this provision was intended to require continuance of the evidentiary rules applicable to Part B cases with the result that the presumption of physical disability created by 20 C.F.R. Sec. 727.203(a) could not be rebutted solely by proof that the claimant is not physically disabled for his usual coal mine work. This is the view expressed in the Taft and Beatrice cases, infra, with which we agree.
 
 
 24
 Ramey maintains that this court's decision in Haywood v. Secretary of Health and Human Services, 699 F.2d 277 (6th Cir.1983) is controlling in the instant case. The Haywood decision involved a black lung claim brought under Part B of the Act which is administered by the Social Security Administration. The Haywood court held that in a Part B black lung case, once the presumption of disability arises under 20 C.F.R. Sec. 410.490, the presumption can be rebutted only if the employer demonstrates that the claimant is capable of performing mine work or comparable work and that such work is available. Id. at 285. The court stated, "[t]he Secretary cannot rebut the presumption unless he demonstrates that the claimant is not vocationally disabled in the immediate area around his home." Id.
 
 
 25
 In the instant case, the claimant's action arises under Part C of the Act which is administered by the Department of Labor. The Eleventh Circuit found that Haywood was inapposite to Part C cases. Taft v. Alabama By-Products Corp., 733 F.2d 1518, 1522 (11th Cir.1984). Like the Taft court, we find that our Haywood decision is not applicable to Ramey's Part C claim for reasons heretofore indicated.
 
 
 26
 Our review of the Act, its legislative history, applicable regulations and relevant precedent convinces us that vocational proof is not required under Part C to rebut the presumption where it is shown that the claimant is "able to do his usual coal mine work."
 
 
 27
 The Board's decision in Petitioner Ramey's case is Affirmed.
 
 II. Lewis
 A. Vocational Evidence
 
 28
 Like Petitioner Ramey, Petitioner Lewis contends that the ALJ improperly found that the presumption was rebutted under 20 C.F.R. Sec. 727.203(b)(2) because the ALJ failed to consider vocational evidence. For the reasons discussed above, we find that, even if (b)(2) were a relevant provision in this context, the test of total disability is solely a medical test and that Lewis' contention is without merit.[7]
 
 B. Evidence of Cardiovascular Disease
 
 29
 The ALJ also found that the employer had rebutted the presumption under 20 C.F.R. Sec. 727.203(b)(3) because Lewis' disability was attributable entirely to his cardiovascular disease and that the disease did not stem, in whole or in part, from his coal mining work.
 
 
 30
 Lewis' last day of work was September 24, 1976. On October 5, 1976, Lewis entered St. Joseph's Hospital in Lexington, Kentucky where he underwent cardiac catheterization. Dr. Donald Wakefield, Lewis' treating physician, diagnosed primary myocardial disease of undetermined etiology and ventricular arrhythmia.
 
 
 31
 On October 25, 1976, Dr. Lowell Martin, a general practitioner, found that Lewis' x-ray revealed stage 2/2 "q" pneumoconiosis category A. However, Dr. E.N. Sargeant, a Board certified radiologist and a "B" reader, re-read the x-ray taken by Dr. Martin as negative for pneumoconiosis. Dr. Martin also noted pleural thickening and left ventricular prominence. He opined that Lewis should not return to underground coal mining because of his silicosis.
 
 
 32
 Dr. James D. Adams, a general practitioner, examined Lewis on November 2, 1976, and noted fibronodular densities and linear fibrosis consistent with a diagnosis of coal worker's pneumoconiosis. In Adams' opinion, Lewis was suffering from coal worker's pneumoconiosis and organic heart disease. He recommended that pulmonary function studies should be performed to determine the degree of Lewis' pulmonary impairment and recommended that Lewis avoid further dust exposure. However, the x-ray taken by Dr. Adams was re-read by Dr. E.N. Sargeant, a Board certified radiologist and "B" reader, as negative for pneumoconiosis.
 
 
 33
 On December 9, 1976, Dr. Richard P. O'Neill, a pulmonary specialist, examined Lewis and diagnosed chronic bronchitis, simple stage 1/1 ("p" and "q") pneumoconiosis and myocarditis of undetermined etiology. Dr. O'Neill noted that Lewis declined to do a spirometry because of his heart problem. Lewis' blood gas studies were normal. Dr. O'Neill stated that if Lewis did not suffer from a heart condition, Lewis could perform light physical labor, providing he was not exposed to dust.
 
 
 34
 Dr. Ballard Wright examined Lewis on February 23, 1977. He diagnosed arteriosclerotic heart disease with old inferior wall infarction by history and a history of angina. Dr. Ballard Wright found no evidence of pneumoconiosis. Dr. Wright noted that Lewis did not undergo spirometry tests and that Lewis' blood gas results were consistent with heart disease. He stated that Lewis' x-ray revealed "no active disease within the chest."
 
 
 35
 A February 28, 1977, examination of Lewis conducted by Dr. Harvey A. Page revealed that Lewis had a history of arteriosclerotic heart disease. Dr. Page remarked that Lewis' personal physician had advised Lewis not to undergo spirometric testing because of his heart condition.
 
 
 36
 Dr. Frank T. Varney, a general practitioner, examined Lewis on May 5, 1977, and found that Lewis' x-ray revealed pneumoconiosis class 1/2 "q" Dr. Varney noted that pulmonary function studies were not performed because of Lewis' cardiovascular disease.
 
 
 37
 On December 14, 1978, Dr. William H. Anderson, a pulmonary specialist, examined Lewis and diagnosed category II pneumoconiosis, cardiovascular disease and osteoarthritis of the spine. An electrocardiogram performed by Dr. Anderson revealed an interventricular conduction defect with frequent premature ventricular contractions. Dr. Anderson noted that pulmonary function studies were not done because Lewis stated to Dr. Anderson that he had too much heart disease to undergo pulmonary function testing. In his deposition testimony, Dr. Anderson indicated that Lewis' heart disease did not stem from Lewis' exposure to coal dust. Dr. Anderson stated that Lewis would be functionally able to perform hard manual labor but for his heart disease.
 
 
 38
 Dr. Allen Cornish, a Board certified radiologist and "B" reader, examined x-rays taken on December 30, 1976, and on February 28, 1977, and found "no evidence of pneumoconiosis." Dr. Cornish also examined Lewis on February 28, 1980, and diagnosed only heart disease and obesity. In his deposition testimony, Cornish indicated that Lewis' chest report was negative and that he saw "no deterrent to Lewis' returning to work in the mines."
 
 
 39
 The ALJ evaluated all the medical evidence and concluded that Lewis had a totally disabling heart disease unrelated to his coal mine employment, but that he did not have a totally disabling pulmonary impairment. He held that the employer rebutted the presumption under 20 C.F.R. Sec. 727.203(b)(3).
 
 
 40
 This court recently discussed rebuttal under 20 C.F.R. Sec. 727.203(b)(3) in Gibas v. Saginaw Mining Co., 748 F.2d 1112 (6th Cir.1984). In Gibas, a black lung claimant, as here, suffered from cardiovascular disease and pneumoconiosis. The ALJ determined that the presumption of total disability due to black lung disease had been established pursuant to 20 C.F.R. Sec. 727.203(a) and that the presumption had not been rebutted under 20 C.F.R. Sec. 727.203(b)(3) because it had not been shown that the disability was not in part caused by the black lung disease. It was argued that the ALJ's decision resulted in the allowance of benefits where the claimant was not totally disabled due to black lung disease as is required by the Act. The Gibas court, after pointing out that the presumption of total disability due to black lung disease had been established, then said:
 
 
 41
 Thus, section 727.203(b)(3) does not permit the award of benefits for partial disability; it merely grants an employer the chance to prove that a miner's disability did not arise, in whole or in part, from his coal mine employment. If an employer is able to prove that pneumoconiosis played no part in causing a miner's disability, then the employer has satisfied the requirements of section 727.203(b)(3). Where, however, pneumoconiosis is a contributing cause to a miner's total disability, he is conclusively entitled to benefits.
 
 
 42
 748 F.2d at 1120. We make this particular reference to Gibas to demonstrate that the holding there is not inconsistent with the holding here. In this case, the ALJ found that Lewis' cardiac condition was the sole cause of his total disability, and this decision is supported by substantial evidence, while the Gibas court found that Gibas' pneumoconiosis was a contributing cause to the miner's total disability.
 
 
 43
 The Board's decision in the Lewis case is therefore Affirmed.
 
 
 44
 NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.
 
 
 45
 The appellant miners, Ramey and Lewis, have been denied benefits available through the Black Lung Benefits Reform Act. In considering each miner's application for benefits, the administrative law judges (ALJs) invoked the presumption of total disability due to pneumoconiosis in favor of the miner. 20 C.F.R. Sec. 727.203(a). Our review concerns the ALJs' determinations that the miners' employers rebutted the presumption of total disability. Ramey was found to be able to do his usual coal mine work. 20 C.F.R. Sec. 727.203(b)(2). Lewis was found to be disabled by heart disease which did not stem, in whole or in part, from his coal mine work. 20 C.F.R. Sec. 727.203(b)(3).
 
 
 46
 20 C.F.R. Sec. 727.203(b)(2) allows an employer to rebut the presumption of total disability by demonstrating that the miner either "is able to do his usual coal mine work or comparable and gainful work (see Sec. 410.412(a)(1) of this title)." This provision establishes a two-step analysis. If the employer demonstrates that the miner is able to do his usual coal mine work, there is no need to consider his ability to do comparable and gainful work. If the employer fails to demonstrate that the miner is able to do his usual coal mine work, the inquiry shifts to whether the miner can perform comparable and gainful work. Resolution of this second issue necessarily involves proof that, in light of the physical and vocational capacity of the miner, he can perform comparable and gainful work which is available to him in the immediate area of his residence. Shamrock Coal Co. v. Lee, 751 F.2d 187 (6th Cir.1985).
 
 
 47
 The Court today rules that the inquiry under the first clause of section 727.203(b)(2), concerning whether the miner is able to do his usual coal mine work, is solely a question of physical capacity. Thus, vocational evidence is irrelevant and the presumption of disability can be rebutted by medical evidence alone. I recognize that the Eleventh, Fourth, and Third Circuits have adopted this interpretation; as a matter of judicial discipline, I concur in application of this rule in the Sixth Circuit. I write separately on this issue, however, because I believe that these precedents are incorrect.[1]
 
 
 48
 In order to remedy the inadequate or nonexistent workers' compensation coverage of miners under state law, Congress established a national compensation program which provides benefits to miners who have become disabled by pneumoconiosis or to their survivors. Underhill v. Peabody Coal Co., 687 F.2d 217, 218-19 (7th Cir.1982). Congress first established this program in 1969, then amended it in 1972, and again in 1977. Initially, the Social Security Administration administered the program (Part B Claims). Claims filed on or after July 1, 1973 are the responsibility of the Department of Labor (DOL) (Part C claims). Under the authority of the 1977 amendments, the DOL promulgated Interim Regulations, including 20 C.F.R. Sec. 727.203(b)(2). These regulations govern claims, such as those of Ramey and Lewis, which were filed on or after July 1, 1973 and before March 1, 1980. Id. at 219-20.
 
 
 49
 Congress amended the black lung benefits program in 1972 and again in 1977 for one simple reason: to benefit more miners by expanding coverage and liberalizing eligibility restrictions. Id. at 220. Not only did Congress in 1977 broaden the definition of pneumoconiosis, id.; see 30 U.S.C. Sec. 902(b), it also required the DOL to promulgate medical and evidentiary criteria for determining total disability which "shall not be more restrictive" than the medical and evidentiary criteria applied to Part B claims. Underhill, 687 F.2d at 220; see 30 U.S.C. Sec. 902(f)(2). We must interpret 20 C.F.R. Sec. 727.203(b)(2) in light of this statutorily-expressed Congressional intent.
 
 
 50
 The regulation that defined total disability for the purpose of Part B claims was 20 C.F.R. Sec. 410.412(a). This Court has construed vocational evidence to be highly relevant to a disability determination under that provision:
 
 
 51
 A claimant is totally disabled if his pneumoconiosis prevents him from obtaining work as a coal miner in the immediate area of his residence on July 1, 1973....
 
 
 52
 The Secretary cannot rebut the presumption of total disability unless he demonstrates that the claimant is not vocationally disabled in the immediate area around his home.
 
 
 53
 Haywood v. Secretary of Health & Human Services, 699 F.2d 277, 285 (6th Cir.1983) (emphasis added). Given Congress's express intent to liberalize eligibility criteria in the black lung benefits program and the recent precedent holding that vocational evidence is essential to rebuttal of presumed disability of a Part B claimant, one would expect only compelling authority to lead this Court to restrict to medical evidence alone the relevant proof that a presumably disabled Part C claimant is "able to do his usual coal mine work."
 
 
 54
 Two sources of authority support today's ruling. First, three circuits have found that medical evidence alone may establish a miner's ability to do his usual coal mine work. In Sherry v. Tesone Coal Co., 696 F.2d 985 (3d Cir.1982), the Third Circuit affirmed the Benefits Review Board in an unpublished opinion. The Fourth Circuit failed to consider the legislative history of the 1977 amendments and, therefore, incorrectly concluded that, because "no language in the regulations requir[es] vocational evidence as a necessary element of rebuttal," vocational evidence is irrelevant. Director, Office of Workers' Compensation Programs v. Beatrice Pocahontas Co., 698 F.2d 680, 682 (4th Cir.1983). The Eleventh Circuit followed Beatrice Pocahontas, primarily on the ground that black lung benefits "should not be a form of unemployment compensation." Taft v. Alabama By-Products Corp., 733 F.2d 1518, 1522 (11th Cir.1984). The rebuttal provisions of section 727.203(b), however, only apply once medical evidence alone has established the presumption of total disability. 20 C.F.R. Sec. 727.203(a). Consequently, black lung benefits will not become simply unemployment compensation. Most significantly, the decisions upon which this Court now relies have neither examined the legislative history of the 1977 amendments nor weighed the remedial purposes of the Black Lung Reform Act.
 
 
 55
 Secondly, today's decision does examine legislative history, and places great reliance upon the Conference Committee Report which accompanied the 1977 amendments. The Conference Report provides that DOL regulations are not to impose more restrictive criteria than those applicable to Part B claims, "except that ... all relevant medical evidence shall be considered." H.R.Rep. 864, 95th Cong.2d Sess. (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 308, 309. (Emphasis added). This Court interprets the above statement to require that only medical evidence shall be considered, and to demonstrate an altered congressional intent to exclude vocational evidence from consideration. After examination, I find nothing in the quoted legislative history that reveals to me a congressional intent to establish a medical test for rebuttal of presumed disability.
 
 
 56
 A former counsel to the Department of Labor has explicated the intent with which the Congressional conferees drafted the particular language on which this Court relies:
 
 
 57
 The conferees were most troubled by the allegation that the Social Security Administration treated its interim presumption as irrebuttable, thus engaging in only a perfunctory investigation of the claims. To ensure that the Secretary of Labor did not follow this practice, the conferees, after heated debate, agreed upon the following Report language:
 
 
 58
 With respect to a claim filed or pending prior to the promulgation of such [new] regulations such regulations shall not provide more restrictive criteria than those applicable to a claim filed on June 30, 1973, except that in determining claims under such criteria all relevant medical claims evidence shall be considered in accordance with standards prescribed by the Secretary of Labor and published in the Federal Register.
 
 
 59
 By this statement the conferees alerted the Secretary of Labor that he was not to treat the interim presumption as irrebuttable.
 
 
 60
 Solomons, A Critical Analysis of the Legislative History Surrounding the Black Lung Interim Presumption and a Survey of Its Unresolved Issues, 83 W.Va.L.Rev. 869, 893 (1981) (footnotes omitted) (brackets in original). The Conference Committee intended to compel the DOL to consider, rather than continue to ignore, relevant medical evidence; the conferees did not intend thereby to exclude relevant vocational evidence from consideration.
 
 
 61
 Today's opinion places a strained interpretation upon the Conference Committee Report, and then rejects without analysis the plain meaning of 30 U.S.C. Sec. 902(f)(2), through which Congress provided that DOL criteria applicable to Part C claims "shall not be more restrictive than the criteria applicable" to Part B claims. Congress intended both vocational and medical evidence to be relevant to the first clause of section 727.203(b)(2).
 
 
 62
 I dissent from the Court's holding that Lewis's claim was properly denied on the basis that he was disabled only by heart disease which did not stem, in whole or in part, from his coal mine work. 20 C.F.R. Sec. 727.203(b)(3). The majority properly states the standard articulated in Gibas v. Saginaw Mining Co., 748 F.2d 1112 (6th Cir.1984). To rebut the presumption of total disability under section 727.203(b)(3) the employer must "prove that pneumoconiosis played no part in causing a miner's disability." Id. at 1120. Lewis's employer, Left Beaver Coal Company, has not met its burden of rebuttal.
 
 
 63
 Lewis is disabled by heart disease. Dr. Donald Wakefield, Lewis's treating physician reported that Lewis suffers "cardiomyopathy of undetermined etiology." Dr. Richard P. O'Neill was similarly unable to establish the origin of Lewis's heart condition. Dr. James Adams testified that Lewis's pneumoconiosis would aggravate any underlying coronary artery disease. Despite the testimony of Dr. William H. Anderson that the general public is subject to the type of heart condition which Lewis suffers, the employer failed to "prove that pneumoconiosis played no part in causing" the miner's disability. Lewis's presumption of total disability was not rebutted under section 727.203(b)(3); his application should be remanded for a grant of benefits. This Court's refusal to direct a remand compels me to respectfully dissent.
 
 
 
 [1]
 Section 727.203(a) provides that a miner who engaged in coal mine employment for at least ten years will be presumed to be totally disabled due to pneumoconiosis if his chest x-ray establishes the existence of pneumoconiosis, ventilatory studies establish the presence of a chronic respiratory or pulmonary impairment, blood gas studies demonstrate the presence of an impairment in the transfer of oxygen from the lungs to the blood, or other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment
 
 
 [2]
 20 C.F.R. Sec. 727.203(b) provides:
 In adjudicating a claim under this subpart, all relevant medical evidence shall be considered. The presumption in paragraph (a) of this section shall be rebutted if:
 (1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see Sec. 410.412(a)(1) of this title); or
 (2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work (see Sec. 410.412(a)(1) of this title); or
 (3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or
 (4) The evidence establishes that the miner does not; or did not have pneumoconiosis.
 
 
 [3]
 The finding of the ALJ that the presumption was rebutted under Sec. 727.203(b)(2) seems inappropriate because (b)(2) provides that rebuttal is accomplished if it is established that claimant can do coal mine work. The ALJ determined, on the contrary, that Lewis could not do coal mine work but because of a heart condition not related to such work. Accordingly, Sec. 727.203(b)(3) would be the appropriate provision to apply and, as stated above, the ALJ also found that the presumption was rebutted under that provision
 
 
 [4]
 Readers are rated in accordance with their qualifications. "B" readers are more qualified than "A" readers and "C" readers are more qualified than "B" readers
 
 
 [5]
 It should be carefully noted that the decision of the ALJ was that the presumption was rebutted under 20 C.F.R. Sec. 727.203(b)(2) by proof that Ramey could do "his usual coal mine work," not by proof that he could do "comparable and gainful work." If the finding had been that the presumption was rebutted because Ramey could do "comparable and gainful work," our rebuttal analysis would be controlled by Shamrock Coal Co. v. Lee, 751 F.2d 187 (6th Cir.1985). There it was held that, while vocational evidence is necessary to rebut the presumption, it is not necessary to show that the claimant has a reasonable opportunity to be hired. On the contrary, this court held: "We agree that the proper inquiry of the Board is to determine whether 'in light of the impairment, age, education, and work experience or skills of the miner, he is unable to engage in any comparable and gainful work that is available to him in the immediate area of his residence.' " Id. at 190 (quoting Central Appalachian Coal Co. v. Fletcher, 679 F.2d 1086, 1089 (4th Cir.1982)). This decision in effect recognizes that 20 C.F.R. Sec. 727.203(b)(2), in providing that rebuttal of the presumption can be effected by proving that the claimant can do "comparable and gainful work," refers to 20 C.F.R. Sec. 410.412(a)(1) for a definition of such work. There "comparable and gainful work" as defined contemplates proof that the claimant can do work available in his community
 
 
 [6]
 It should be noted that our holding that vocational evidence is not necessary to rebut the first portion of the 20 C.F.R. Sec. 727.203(b)(2) presumption in Part C cases is consistent with the unpublished per curiam opinion of this court in Crider v. Island Creek Coal Co., 723 F.2d 908 (6th Cir.1983). Crider, of course, has no precedential value, 6th Cir.R. 24(b), and we mention Crider only because the case has been cited by other circuits. See, e.g., Taft v. Alabama By-Products Corp., 733 F.2d 1518, 1522 (11th Cir.1984)
 
 
 [7]
 As heretofore indicated (note 3), we do not believe that 20 C.F.R. Sec. 727.203(b)(2) is apposite here since the finding was that Lewis was unable to do coal mine work but because of a heart condition unrelated to the work. Thus, only Sec. 727.203(b)(3) could have been applicable, and Lewis does not even contend that vocational evidence is required to rebut under (b)(3)
 
 
 [1]
 I concur without reservation in the determination that substantial evidence supports the ALJ's finding that Ramey was physically able to do his usual coal mine work; that determination should not end the matter. The presumption in favor of Lewis was not rebutted under Sec. 727.203(b)(2). A heart condition rendered Lewis physically incapable of doing his usual coal mine work. He was not shown to be able to do comparable and gainful work