**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,**

v.

**Aleen E. BALL, Respondent.**

**No. 86–2740.**

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1987.

Decided Aug. 7, 1987.

Priscilla Anne Schwab, U.S. Dept. of Labor, Office of Solicitor, Washington, D.C., for petitioner.

Jack N. Vanstone, Vanstone & Krochta, Evansville, Ind., for respondent.

Before WOOD and EASTERBROOK, Circuit Judges, and WILL, Senior District Judge.[*]

HARLINGTON WOOD, Jr., Circuit Judge.

Petitioner, the director of the Department of Labor's Office of Workers' Compensation Programs ("Director"), seeks review of an order of the Department of Labor's Benefits Review Board ("Review Board") granting benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901 et seq. (1982) to respondent Aleen Ball. The Review Board, relying on its previous decision in Fletcher v. Director, OWCP, BRB No. 83–790 BLA, slip op. (July 7, 1986) (en banc),[1] reversed the decision of an administrative law judge ("ALJ") through its order. The ALJ had denied benefits to Mrs. Ball because she failed to establish that she was financially dependent upon her former husband, a miner, at the time of his death under the applicable statutory and regulatory definitions of the Black Lung Benefits Act.

Because we review an action taken by an administrative agency, the Department of Labor, our standard of review is governed by the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551 et seq. (1982). The parties do not dispute the facts. Therefore our review is limited to interpreting statutory and regulatory language, something we do as a matter of law. E.g., Lorenz v. Sauer, 807 F.2d 1509, 1511 (9th Cir.1987). For matters of law, the APA mandates de novo review. 5 U.S.C. § 706 (1982) ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law...."); FTC v. Indiana Federation of Dentists, 476 U.S. 447, 106 S.Ct. 2009, 2015–16, 90 L.Ed.2d 445 (1986).

A reviewing court, however, will temper that general mandate of de novo review by according some deference to the agency's legal interpretations. The reviewing court will defer to the agency's interpretation of the agency's own regulation " 'unless [the interpretation] is plainly erroneous or inconsistent with the regulation.' " Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); ITEL Corp. v. United States Railroad Retirement Board, 710 F.2d 1243, 1244 (7th Cir.1983) ("A 'reasonable basis' test is appropriate when passing upon an agency's construction of the statutes which it administers.").

■ A question arises, however, as to which part of an agency the deference should be granted when different parts of the agency disagree as to the proper legal interpretation of a regulation. In this case, for example, the Director takes the view that the Department of Labor's regulations should be construed to deny benefits to Mrs. Ball, while Mrs. Ball relies on the Review Board's interpretation of the regulations that she is entitled to benefits. But as we have previously noted, "[t]he [Review] Board's interpretation of the [Black Lung Benefits] Act is 'not entitled to any special deference from the courts.' " Peabody Coal Co. v. Blankenship, 773 F.2d 173, 175 (7th Cir.1985) (quoting Potomac Electric Power Co. v. Director, 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446 (1980)). Rather, a reviewing court "shows great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). In the Department of Labor the Director is responsible as a policy maker for the implementation and administration of the regulations and his interpretation, not the Review Board's, of the regulations will receive def-

---

[*] The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. The Director filed an appeal in Fletcher in the Fourth Circuit on September 3, 1986. Seven months later, and just ten days before we heard oral argument in this case, the Fletcher appeal was voluntarily dismissed on April 6, 1987.

erence. *See Potomac Electric Power Co. v. Director,* 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446 (1980).

Mrs. Ball was married to Robert Ball, a miner, in 1931 and was divorced from him in 1954. The divorce decree ordered Mr. Ball to pay $10 per week for the support of a sixteen-year-old child. Mr. Ball also voluntarily contributed substantially to Mrs. Ball's support during the years immediately following the divorce. Thereafter Mr. Ball's contributions to Mrs. Ball decreased until the early 1970s when Mr. Ball became disabled by black lung disease and his contributions to Mrs. Ball ceased altogether. After Mr. Ball retired he began receiving social security benefits in 1972. He also received black lung benefits. In 1973 Mrs. Ball became eligible for social security old-age retirement benefits based on Mr. Ball's earnings record as a miner. Mr. Ball died in 1975. Since the time of Mr. Ball's death, Mrs. Ball has received social security benefits as a surviving divorced spouse. These social security benefits have been Mrs. Ball's sole means of support since she began receiving them.

In addition to receiving the social security benefits, Mrs. Ball twice sought benefits in 1978 under the Black Lung Benefits Act as the surviving divorced wife of Mr. Ball. The Department of Labor denied Mrs. Ball's request for benefits both times. Mrs. Ball demanded and received a formal hearing before an ALJ. The ALJ also denied benefits. Mrs. Ball appealed the decision and order of the ALJ to the Review Board. The Review Board reversed and awarded benefits to Mrs. Ball.

There is only one issue that confronted the ALJ and the Review Board that we consider now on appeal. That issue is whether Mrs. Ball's social security benefits, which she receives as a surviving divorced wife, qualify as support from a miner under the Black Lung Benefits Act.

The Black Lung Benefits Act provides benefits to, among other recipients, the widows of coal miners who are totally dis-abled at the time of death by pneumoconiosis.[2] 30 U.S.C. § 922(a)(2) (1982). A widow is defined in the Black Lung Benefits Act as, among other definitions, a. "surviving divorced wife." 30 U.S.C. § 902(e) (1982). A surviving divorced wife is not defined in the Black Lung Benefits Act. Instead, the Black Lung Benefits Act takes its definition of a surviving divorced wife from the Social Security Act. 30 U.S.C. § 902(e) (1982). Under the Social Security Act, "[t]he term 'surviving divorced wife' means a woman divorced from an individual who has died, but only if she had been married to the individual for a period of 10 years immediately before the date the divorce became effective." 42 U.S.C. § 416(d)(2) (1982). Mrs. Ball was divorced from Mr. Ball, who died in 1975. The Balls were married in 1931 and divorced in 1954, a period of twenty-three years. Thus, Mrs. Ball qualified as a surviving divorced wife under the Social Security Act's definition and thereby derivatively under the Black Lung Benefits Act.

To recover benefits under the Black Lung Benefits Act, a surviving divorced wife must show that she was financially "dependent on the miner," 20 C.F.R. § 725.217(a) (1986), by demonstrating that she falls within one of three categories: (1) a widow who "was receiving at least one-half of her support, as determined in accordance with regulations prescribed by the Secretary, from the miner;" (2) a widow who "was receiving substantial contributions from the miner (pursuant to a written agreement);" or (3) a widow for whom "there was in effect a court order for substantial contributions to her support from the miner at the time of his death." 30 U.S.C. § 902(e) (1982).

Mrs. Ball did not receive substantial contributions from Mr. Ball pursuant to a written agreement. Neither was she entitled to substantial contributions for her own support from Mr. Ball pursuant to a court order in effect at the time of Mr. Ball's death—the 1954 divorce decree had ordered

---

**2.** Pneumoconiosis is a dust disease of the lungs brought on by coal mine employment and is commonly known as black lung.

support for a teenaged child, not for Mrs. Ball. Moreover, any transfer of money under that divorce decree would have ceased when the child became an adult, an event that would have occurred long before Mr. Ball's death in 1975. Consequently, Mrs. Ball potentially qualifies under only one of the three categories of surviving divorced wives entitled to benefits. That one category requires Mrs. Ball to have been "receiving at least one-half of her support, as determined in accordance with regulations prescribed by the Secretary, from the miner." 30 U.S.C. § 902(e) (1982). Mrs. Ball argues that her receipt of social security benefits resulting from her husband's employment satisfies this requirement of financial dependency. The Director contends that it does not.

To determine whether Mrs. Ball was receiving at least one-half of her support from Mr. Ball, the Black Lung Benefits Act directs us to look at the Secretary of Labor's ("Secretary") regulations. Those regulations state that

> [t]he term "one-half support" means that the miner made regular contributions, in cash or in kind, to the support of a divorced spouse at the specified time or for the specified period, and that the amount of such contributions equalled or exceeded one-half the total cost of such individual's support at such time or during such period.

20 C.F.R. § 725.233(g) (1986). Mrs. Ball's sole source of income since 1973 has been her receipt of social security benefits. She thus meets the "one-half" requirement of the Secretary's regulations. But the question remains whether Mrs. Ball's receipt of social security benefits, resulting from Mr. Ball's employment, means that Mr. Ball "made regular contributions, in cash or in kind, to the support" of Mrs. Ball.

The Secretary's regulations define "regular contributions" as "contributions that are customary and sufficient to constitute a material factor in the cost of the individual's support." 20 C.F.R. § 725.233(c) (1986). Contributions, in turn, are defined as "contributions actually provided by the contributor from such individual's property, or the use thereof, or by the use of such individual's own credit." 20 C.F.R. § 725.-233(b) (1986).

■ The principal question is whether or not the social security benefits Mrs. Ball receives are the "property" of Mr. Ball.[3] We believe they are not. Neither the Black Lung Benefits Act nor the Secretary's regulations define property, so we must look elsewhere for a definition. It is true under *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), "that the interest of an individual in continued receipt of [social security] benefits is a statutorily created 'property' interest protected by the Fifth Amendment." *Id.* at 332, 96 S.Ct. at 901. In the *Eldridge* context an individual has a due process right to the administrative procedures set out in the Social Security Act before existing benefits payments are stopped, but the individual does not necessarily have the right to an evidentiary hearing. But Mrs. Ball is not asking for due process of law before her social security benefits are terminated—no threat exists to the continued payment of her social security benefits. Rather, she asks us to characterize her receipt of social security benefits as property for purposes of the Black Lung Benefits Act, not for purposes of constitutional due process. Even assuming we decided that the *Eldridge* language could be used to describe Mrs. Ball's receipt of social security benefits as property under the Black Lung Benefits Act,[4] how-

**3.** The Review Board, in *Fletcher v. Director, OWCP*, BRB No. 83–790 BLA, slip op. (July 7, 1986) (en banc), decided that social security benefits are the miner's property in this context. The Review Board also held that "[t]he earnings record of the miner is a form of credit within the purview of Section 725.233(b), and that credit provides the basis for determining the amount payable to the miner's surviving divorced spouse." *Id.* at 2. We decide the question

only of whether the social security benefits are the miner's property. Neither party raised the issue of whether Mrs. Ball's receipt of social security benefits qualifies as receiving contributions from a form of Mr. Ball's credit and we do not decide the issue here.

**4.** Although we do not decide the issue, there is a question whether social security benefits are an accrued property right. The Supreme Court has explained that

ever, we believe that to aim at the social security benefits as Mrs. Ball's property misses the mark. The question is not whether those payments are Mrs. Ball's property, which they possibly may be, the question is whether the government's social security payments to Mrs. Ball are payments "from [Mr. Ball's] property" under the Black Lung Benefits Act. 20 C.F.R. § 725.233(b) (1986). Mrs. Ball urges us to characterize the social security benefits she receives as payments from Mr. Ball's own property: "The Social Security benefits which the Claimant receives are derived from contributions made from the miner's wages, only held in trust by the government, and therefore these benefits are derived from the miner's property." Mrs. Ball contends that Mr. Ball contributed part of his wages under the Federal Insurance Contributions Act, 26 U.S.C. §§ 3101 *et seq.* (1982), to provide future payments to himself, his wife, and possibly others. These contributions to the government fund, Mrs. Ball claims, were Mr. Ball's property at the time of contribution and continued to be his property until money from the fund was paid out to Mrs. Ball. Indeed, Mrs. Ball contends, "[t]he government only administers the money withheld from wages."

Mrs. Ball's characterization of Mr. Ball's contributions to the fund and her receipt of money from the fund is only partially true. It is correct, for example, that Mr. Ball's contributions to the fund were his property at the time of contribution. And it is also true that the amount of Mr. Ball's contributions was related to the amount of his wages. But it is not true that the government merely held Mr. Ball's property in trust for future payment to Mrs. Ball. The funds available for payment of social security benefits are generated from an excise tax on employers, 26 U.S.C. § 3111(a) (1982), as well as from an income tax on

individual wage earners, 26 U.S.C. § 3101(a) (1982). A recipient of social security benefits has no substantive right to a certain amount of benefits based on the amount contributed to the fund by employer and employee; rather, the recipient's amount of benefits is controlled by operation of law under 42 U.S.C. § 402 (1982), a separate statutory scheme. *Cf. Heckler v. Mathews*, 465 U.S. 728, 737, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984). As a result, "eligibility for [social security] benefits, and the amount of such benefits, do not in any true sense depend on contribution to the program through the payment of taxes," which are levied on employer and employee alike. *Flemming v. Nestor*, 363 U.S. 603, 609, 80 S.Ct. 1367, 1371, 4 L.Ed.2d 1435 (1960). None of the criteria listed in the payout scheme mentions the amount contributed by the employer or employee. Moreover, Congress at any time could legislatively alter or abolish altogether the benefits program irrespective of the contributions of employers and employees. Therefore, we cannot say that Mrs. Ball's receipt of social security benefits is a receipt of "contributions actually provided by the contributor from such individual's property," 20 C.F.R. § 725.233(b) (1986), that would qualify as support for purposes of the Black Lung Benefits Act.

This construction of the statutory and regulatory language on its face is supported by practical considerations of legislative intent. The Black Lung Benefits Act does not define "surviving divorced wife," but instead refers to the definition contained in the Social Security Act. This section of the Black Lung Benefits Act was modelled after a similar section in the Social Security Act. The Social Security Act originally did not provide benefits to a divorced wife. But in 1950 Congress amended the Social Security Act to broaden the

each worker's benefits, though flowing from the contributions he made to the national economy while actively employed, are not dependent on the degree to which he was called upon to support the system by taxation. It is apparent that the noncontractual interest of an employee covered by the [Social Security] Act cannot be soundly analogized to that of

the holder of an annuity, whose right to benefits is bottomed on his contractual premium payments.
*Flemming v. Nestor*, 363 U.S. 603, 609–10, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435 (1960). We leave for another day the question of the precise nature of Mrs. Ball's interest in the social security benefits she receives.

class of recipients by allowing a surviving divorced wife, who met other qualifications, to receive social security benefits if she was receiving one-half of her support from her former husband at the time of his death. In interpreting this social security provision, the Tenth Circuit stated that the provision's purpose and objective was "to extend mother's benefits to a former wife whose economic relationship to the insured wage earner was such that she *sustained economic loss arising out of his death."* *Schroeder v. Hobby,* 222 F.2d 713, 715 (10th Cir.1955) (emphasis added); *Adair v. Finch,* 421 F.2d 652, 654 (10th Cir.1970). A district court considering the same social security provision also explained:

> The purpose of widow's insurance benefits is to provide the widow of a wage earner a modicum of maintenance after her husband's death dries up her source of support. These benefits are to make up for an actual economic loss arising out of the death of the wage earner. *Adair v. Finch,* 421 F.2d 652 (10th Cir. 1970); *Collins v. Finch,* 311 F.Supp. 301 (W.D.Pa.1970). In this case there was no economic loss upon the wage earner's death. The plaintiff's economic condition did not change one iota due to the deceased wage earner's death. It is hardly the purpose of the Social Security Act to award an estranged wife, who had no economic ties whatever to the wage earner, a windfall upon her former husband's death.

*Roop v. Richardson,* 324 F.Supp. 1130, 1132 (W.D.Va.1971); *Gershman v. Finch,* 454 F.2d 229, 233 (4th Cir.1971).

Thus, under the Social Security Act before 1972, a surviving divorced wife was entitled to benefits only if the death of her former husband caused her actual economic loss because at least one-half of her support was coming directly from the former husband. Because the dependency requirement of the Black Lung Benefits Act was modelled on the Social Security Act's requirement of dependency, it seems to follow that the necessity for showing economic loss at the time of the miner's death to qualify for social security benefits would apply to black lung benefits as well. In

1972, Congress amended the Social Security Act, Amendments to the Social Security Act, Pub.L. No. 92–603, § 114, 86 Stat. 1348 (1972), by deleting the requirement that a surviving divorced wife show financial dependence by demonstrating an actual economic loss at the time of the former husband's death. The Black Lung Benefits Act, however, was not similarly amended. After amending the Social Security Act in 1972, Congress revisited the Black Lung Benefits Act twice, once in 1977 and once in 1981, but it did not remove the financial dependency requirement for a surviving divorced wife to receive black lung benefits. If Congress had wanted to eliminate the requirement of showing an actual economic loss it could have done so, as evidenced by the social security amendments of 1972. The fact that it did not do so indicates Congress intended to retain the requirement of a surviving divorced wife showing economic loss in demonstrating dependency. Perhaps one reason Congress intended to retain the dependency requirement for the Black Lung Benefits Act, but not for the Social Security Act, has to do with the differing nature of the two statutory schemes.

Social security is a federal pension program. It is designed to provide protection against hardships to those persons who qualify for benefits by reason of age or employment status. *See Mathews v. De-Castro,* 429 U.S. 181, 185–86, 97 S.Ct. 431, 434–35, 50 L.Ed.2d 389 (1976).

The Black Lung Benefits Act, on the other hand, establishes a disability program. It is designed to provide benefits to those miners, and to those persons dependent upon them for financial support, who become disabled by black lung disease resulting from working in coal mines. Black lung benefits are intended to compensate for the economic loss suffered by the miner and his financial dependents when he is disabled and no longer able to bring home a paycheck. *See Kidda v. Director,* 769 F.2d 165, 167 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1494, 89 L.Ed.2d 895 (1986). Unlike social security benefits, black lung benefits are not paid to all min-

ers who reach a certain age or who have worked a certain amount of time in mining.

We also believe Congress did not intend to provide a divorced wife a windfall at the time of her former husband's untimely death due to black lung disease. Under the Social Security Act, for example, those recipients who qualify for more than one social security benefit are precluded from receiving a potential windfall by an offset provision. *See* 42 U.S.C. § 402(k) (1982). Similarly, the Black Lung Benefits Act provides that a potential recipient of both state and federal black lung benefits will receive the full state benefit. If the benefit under the state program equals or exceeds the federal benefit, the recipient will receive only the state benefit. If, on the other hand, the state benefit is less than the federal benefit, the recipient will receive the full state benefit plus a federal benefit in an amount sufficient to allow the combined state and federal benefit to equal the full federal benefit. 30 U.S.C. § 932(g) (1982); 20 C.F.R. §§ 725.533–.535 (1986).

Mrs. Ball was receiving her sole support from social security benefits. Mr. Ball's death did not increase or decrease the amount of the social security benefits Mrs. Ball received. We cannot believe that Congress intended for Mrs. Ball then to receive an additional benefit solely because of Mr. Ball's death. Certainly Congress could have foreseen that when a miner died of black lung disease, and in some way was contributing more than one-half of a former wife's support, the former wife would suffer a substantial economic loss due to her former husband's death at a time earlier than the former husband might have

experienced otherwise. Congress reasonably could have intended to provide benefits to that surviving divorced wife to make up an actual economic loss she suffered because of her former husband's death caused by black lung disease. But where the former husband was not actually contributing to the divorced wife's support, his death does not affect the surviving wife's economic situation. It is difficult to imagine that Congress intended to award a surviving divorced wife a windfall based on her husband's death merely because the death was caused by black lung disease, and not because the death from black lung disease caused the widow significant economic harm.

We emphasize, however, that our decision is limited solely to the consideration of whether social security benefits qualify as support from contributions of the miner's property. We have concluded that the social security benefits that Mrs. Ball receives are not the property of Mr. Ball for purposes of the Black Lung Benefits Act. We have supported our conclusion that the social security benefits are not Mr. Ball's property by noting that Mrs. Ball experienced no direct economic loss of social security benefits because of Mr. Ball's death. We do not mean to imply that black lung benefits could never be awarded in the absence of an actual economic loss of support, but we do not make any implication to the contrary either. The Secretary's regulations are silent as to whether social security benefits are the same as or different from other third-party sources of benefits such as private pension plans, annuities, life insurance policies, and the like.[5]

---

**5.** For example, in contrast to social security payments, which are not the miner's property, a private annuity paid for by the miner out of his own pocket, at the time of a divorce settlement, could be viewed either as a replacement for alimony or as the transfer of a lump sum of cash.

Viewed as a replacement for alimony, an annuity would provide monthly payments as support to a surviving divorced wife. But for the annuity, the surviving divorced wife would have received the same monthly payments directly from the miner as alimony. Direct alimony payments from the miner received on a periodic basis would qualify as support.

On the other hand the annuity could be viewed as the transfer of a lump sum of cash. This lump sum transfer would be similar to the transfer of title of the home. The surviving divorced wife, if she received the home as part of a settlement, could sell the home and purchase her own annuity. The monthly annuity payments she would receive would not qualify as support because the annuity, from which the payments came, would be her own property and not the property of the miner.

Thus, our holding that social security benefits are not the miner's property may or may not be persuasive in determining whether other third-

In sum, we conclude that by receiving social security benefits Mrs. Ball was not receiving one-half of her support from contributions of Mr. Ball's property. We do not believe Congress intended a contrary interpretation of the Black Lung Benefits Act. Therefore, the order of the Review Board is

REVERSED.

party sources of income are the miner's proper- ty for purposes of the Black Lung Benefits Act.